# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 16, 2024 Session

## STATE OF TENNESSEE v. TAESHAUN K. PATTERSON

### Appeal from the Circuit Court for Rutherford County
### No. 78464B      James A. Turner, Judge

---

### No. M2023-00794-CCA-R3-CD

---

The Defendant, Taeshaun K. Patterson, was convicted by a Rutherford County Circuit Court jury of first degree felony murder, second degree murder, a Class A felony, facilitation of conspiracy to commit aggravated robbery, a Class D felony, facilitation to commit aggravated robbery, a Class C felony, and robbery in concert with two or more persons, a Class B felony. *See* T.C.A. §§ 39-13-202 (2018) (subsequently amended) (first degree murder), 39-13-210 (2018) (second degree murder), 39-11-403 (2018) (facilitation), 39-12-103 (2018) (criminal conspiracy), 39-13-402 (2018) (aggravated robbery), 39-13-401 (2018) (robbery), 39-12-302 (2018) (sentencing classification for acting in concert). The Defendant was sentenced to life imprisonment. On appeal, he contends that (1) the evidence is insufficient to support his convictions and (2) the trial court should have held a sentencing hearing for the first degree murder conviction. We affirm the judgments of the trial court. However, in light of *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), we remand for the entry of an amended first degree felony murder judgment form to reflect in the special conditions section that the Defendant is entitled to an individualized parole hearing after serving between twenty-five and thirty-six years of his life sentence.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed; Remanded for Amended Judgment

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Kyle D. Parks (on appeal and at trial) and Nathan Cate (at trial), Nashville, Tennessee, for the appellant, Taeshaun K. Patterson.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Trevor Lynch and Will Dement, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the May 16, 2017 shooting death of eighteen-year-old Kendrick Love. At the trial, Jeremy Soto-Morales testified that at the time of the victim's death, he lived in an apartment with his mother, sister, and brother. Mr. Soto-Morales stated that his brother, Charles Mejias,[1] was age seventeen at the time of the shooting and was friends with the Defendant. Mr. Soto-Morales, Mr. Mejias, and the Defendant were indicted in connection with this case.

Mr. Soto-Morales testified that on the day of the shooting, he, Mr. Mejias and the Defendant were in the living room of the apartment and that the men discussed purchasing marijuana from the victim. Mr. Soto-Morales said that the Defendant and Mr. Mejias intended to rob the victim and that Mr. Soto-Morales initially agreed to accompany the men to the robbery. Mr. Soto-Morales said that he entered the kitchen and washed dishes, that he thought about the possible robbery, and that he decided not to accompany them. Mr. Soto-Morales said that he told Mr. Mejias and the Defendant that he would not accompany them and that he advised them not to "do it." Mr. Soto-Morales said that Mr. Mejias and the Defendant left the apartment about three or four minutes later and that Mr. Soto-Morales "went to the store," but he walked around the area looking for the Defendant and Mr. Mejias. Mr. Soto-Morales said that he walked through "some apartments" and that he saw Mr. Mejias, the Defendant, and two other men. Mr. Soto-Morales said that "[t]hey walked past" him, that he continued to walk toward the store, and that he heard "the first couple of gunshots" a few seconds later. Mr. Soto-Morales said that he heard a couple more gunshots, that he ran behind a car, that he saw Mr. Mejias "running and limping," and that he did not see the Defendant. Mr. Soto-Morales stated that after the shooting, he walked to the victim, who lay on the "floor," that a man tended to the victim's wound, and that the man removed a firearm from the victim and placed it on a nearby table. Mr. Soto-Morales said that the police were called to the scene and that he returned to his home.

Mr. Soto-Morales testified that the Defendant possessed a firearm when he left the apartment before the shooting. Mr. Soto-Morales said that although he did not "physically see" the gun, he could "tell if somebody has a gun on them, on their waist."

Mr. Soto-Morales testified that approximately two days after the shooting, he spoke with the police and admitted that he initially lied to the investigators during the police interview, but he ultimately told the police the truth, which was consistent with his trial testimony. He said that he pleaded guilty to robbery in concert with two or more persons in exchange for his truthful testimony at the Defendant's trial and an eight-year sentence.

---

[1] The record contains various spellings of Mejias. We use the spelling reflected in the indictment.

On cross-examination, Mr. Soto-Morales testified that his plea agreement did not require him to testify against his brother. Mr. Soto-Morales recalled that during his police interview, he falsely told the police that he was at the mall at the time of the shooting and that, later during the interview, he was at a party. He agreed he told the police that he did not leave the apartment with the Defendant and Mr. Mejias before the shooting and that they left the apartment to purchase marijuana. Mr. Soto-Morales said that, initially, he did not mention a robbery.

Mr. Soto-Morales testified that Mr. Mejias and the Defendant first discussed purchasing marijuana but then decided to rob the victim. Mr. Soto-Morales said that although he initially decided to accompany the men, he changed his mind because he had to go to work. He said that he advised the men to purchase the marijuana but that the Defendant and Mr. Mejias said, "[W]e're going to go rob them." Mr. Soto-Morales said that they left the apartment and that he followed them through the apartment complex. He said that the separate gunshots sounded as though two guns were fired. He described one group of gunshots as "weak" and the other as "louder" and stated that he did not observe the shooting.

Mr. Soto-Morales testified that he walked to the store and that he saw Mr. Mejias and the Defendant talking to two men. Mr. Soto-Morales said that he continued walking toward the store when the shooting began. He denied telling the police that he stood side-by-side with the Defendant and Mr. Mejias and that he participated in the robbery. Mr. Soto-Morales said he told the police that the Defendant and Mr. Mejias wanted to rob the victim but agreed the investigator was the first person to mention a robbery. He agreed that the investigator yelled at him while standing over him and called him a liar multiple times during the approximate two-and-one-half-hour interview. He agreed that the investigator cursed during the interview and threatened him with spending the remainder of his life "in a box this size." He agreed that the investigator did not believe his version of the events and threatened him once or twice with seeking the death penalty. Mr. Soto-Morales recalled that the investigator falsely claimed witnesses placed him beside the Defendant and Mr. Mejias. Mr. Soto-Morales thought he and Mr. Mejias were being "framed." Mr. Soto-Morales said that he was innocent of the robbery charge to which he pleaded guilty and that he did not plan or scheme with the Defendant and Mr. Mejias to commit a robbery. Mr. Soto-Morales said that he, Mr. Mejias, and the Defendant "just talked about" a robbery and denied that they "came up with a plan."

Mr. Soto-Morales testified that he first mentioned that the Defendant and Mr. Mejias had talked about a robbery after the investigator yelled, cursed, and threatened him with the death penalty. Mr. Soto-Morales did not know whether it was the Defendant or Mr. Mejias who first mentioned a robbery on the day of the shooting. Mr. Soto-Morales agreed that the investigator lied about the existence of evidence implicating him in the robbery and stated that he attempted to "confront" the investigator "with evidence that would have

supported" his version of the events, including asking the investigator to search for a video recording and to speak with Mr. Mejias.

K.H. testified that she and the victim met in high school and that they remained friends after graduation.[2] She said that on the day of the shooting, she, the victim, E.M., and H.B. socialized and made plans for dinner. She said that the victim had been age eighteen, that E.M. had been age seventeen, and that H.B. had been age seventeen. K.H. said that the four of them went to their local hangout spot, McDonald's, and that they left after a few hours to meet an unidentified friend to purchase marijuana. K.H. said that after purchasing about an ounce of marijuana, she intended to treat the group to dinner. K.H. recalled, though, that the victim received text messages from a person the other members of the group did not know and that the victim told the group that they "were going to go over there and see them before" going to dinner. She recalled that the person exchanging messages with the victim first directed the victim to Walgreens and then to an apartment complex but that the person instructed the victim to go to a different apartment complex. She said that she drove to the second complex and that they waited. She recalled that she drove her 2003 Honda Element, photographs of which taken at the scene of the shooting were received as exhibits. She identified the victim's backpack inside her car.

K.H. testified that the victim sat in the front passenger seat, that E.M. sat behind the driver's seat, and that H.B. sat behind the front passenger seat. She said that they waited inside the car for about ten minutes for the person the victim intended to meet and that the car was parked in front of an apartment building. She said that she and the victim noticed someone watching them from an apartment window and that they saw someone's "fingers like popping up the blinds." She said that not too long afterward, "they" came outside. She said that after the victim lowered the passenger-side window, a man approached the window and spoke to the victim. She said the man was between ages sixteen and eighteen, had a "short, black, bushy afro," and wore a white t-shirt with black lettering. She acknowledged that the victim intended to sell the man marijuana and said that E.M. told the man that he could get inside the car for the transaction and then "go on his merry way." She said that the man did not get inside the car, that he interrupted E.M., that he was abrupt and aggressive, and that he told the victim and H.B. to leave the car. K.H. said that she saw another man standing next to the man who stood at the passenger-side door. She said the man who stood at the door opened the victim's door and that the victim willingly left the car. She said that "they" opened the rear passenger-side door and that H.B. left the car, as well. She recalled that the engine of her car remained running.

K.H. testified that after the victim and H.B. were outside of the car and the doors were closed, E.M. moved to the front passenger seat. K.H. recalled having an uneasy feeling and telling the victim to be safe before he left the car. She said that "[t]hey decided

---

[2] It is the policy of this court to refer to minors by their initials.

to take" the victim and H.B. "the opposite way of our car and their own apartment" building. She said all four men walked behind her car, toward another building, and out of her view. She said that she heard gunshots about one minute later, that E.M. left the car and ran toward the victim and H.B., that K.H. drove her car toward the men, and that the victim lay on the ground. K.H. said that the victim had been shot but that "nobody else [was] around" the victim. She said that minutes later, several people came out of their apartments and called 9-1-1 and that four or five people attempted to help the victim before the police and paramedics arrived. She said she spoke to the police at the scene. She said the victim owned a silver and white firearm. A photograph of a silver and white handgun found at the scene was received as an exhibit.

On cross-examination, K.H. testified that although she saw a person's fingers peeking through the blinds, she could not identify the race, height, or build of the person. She said that the victim was the only occupant of her car who knew the man who approached the passenger-side window. She admitted that she had "participated in other drug deals" with the victim and that "sometimes" she participated in other drug transactions inside her car with people she did not know. She agreed that the two men who approached the victim's window did not want to get inside her car.

K.H. testified that after the victim and H.B. left her car, she watched all four men through her rear window. When asked if the men demanded money or marijuana while at the car, she said that they impolitely demanded the victim and H.B. to leave the car. She thought she heard four to six gunshots, which sounded as though they were fired from one firearm. She said the victim's gun was on a nearby picnic table when she reached the victim's location. She said she and E.M. did not move the victim's gun. She said she knew the victim possessed a gun because "he had it on him the whole day," including when he purchased marijuana earlier in the day. She agreed this was the first time she "recognized" the victim "had a firearm." She said that she had seen the victim with a firearm before the day of the shooting. She recalled that the gunshots were close together.

E.M. testified that the victim had been a close friend and that at the time of the victim's death, she was in a romantic relationship with H.B. and lived with K.H. E.M. provided testimony consistent with K.H.'s testimony regarding the sequence of events leading up to the time of the shooting, including purchasing marijuana from an unidentified friend and the victim's receiving text messages from a man who, ultimately, instructed the victim to meet the man at the apartment complex where the shooting occurred. E.M. stated that she, K.H., the victim, and H.B. sat inside K.H.'s parked car for about five to ten minutes and that someone watched them from an apartment window. E.M. said "they" came from the apartment building, that "they" approached the front passenger-side door, that a man spoke to the victim, that "they" demanded the victim and H.B. leave the car, that the men walked behind K.H.'s car, and that she heard gunshots. She said that the two men who approached the car were black, that one man was taller than the other, that one man had "twists or dreads," and that the other man had an "afro." She said that K.H. drove

-5-

toward the victim and that E.M. left the car and ran toward the victim. E.M. said that someone called 9-1-1 and handed her a cell phone but that she did not know the address and gave the phone to another person. She said she looked for but did not find H.B.

E.M. testified that after the victim and H.B. left the car, she moved to the front passenger seat, that she watched all four men walk behind the car and out of her view, and that the men were out of her view for about three to five minutes before she heard four to seven gunshots. She said that she jumped out of the moving car when she heard gunshots and that she ran toward the victim, who lay on the ground, was gurgling, and could not breathe. She identified a photograph, which was received as an exhibit, of her purse inside K.H.'s car.

On cross-examination, E.M. testified that the man who spoke to the victim did not yell, shout, or threaten anyone but demanded that the victim and H.B. leave the car. When describing the gunshots, she said that a "slight pause" occurred and that they were not "back to back to back." She said that it sounded as though the gunshots came from the same firearm. She said that she was the first person to reach the victim and that the victim's handgun was on the "park bench seat." She said that although she could not find H.B. at the scene, she saw him at the police station.

Fatima Hani testified that she lived at the apartment complex on the day of the shooting. She said that just before the shooting, she returned home from the grocery store and saw a group of teenagers "hanging out together." She said that as she retrieved her grocery bags from the car, she heard a gunshot and that she saw a man "try to escape from the other side of the apartment." She said she only caught a glimpse of the man and noticed he wore "something white." She said that the man appeared to be a teenager but that she could not determine his race. She said that she saw a "group of people trying to do something" but that she did not know what was happening. She said that she saw the victim on the ground, that a neighbor, who was panicked, gave her a cell phone, and that she spoke to the 9-1-1 dispatcher. Ms. Hani stated that two girls screamed for someone to help the victim and that someone attempted CPR.

Julio Pozos testified that he lived at the apartment complex at the time of the shooting. He said that he arrived home at 3:30 or 4:00 p.m. and that he heard gunshots. He said he looked outside and saw the victim on the ground. Mr. Pozos said that he went outside to where the victim lay and that nobody else was there. He said that he called 9-1-1 but that due to a language barrier, he gave the phone to a neighbor. Mr. Pozos said that after the police arrived, he told an officer about the handgun at the scene.

Dr. Thomas Deering, a forensic pathologist, testified that he performed the victim's autopsy. Dr. Deering concluded that the cause of death was a gunshot wound to the chest. He said a stipple pattern from gunpowder abrasions on the victim's chest and left arm indicated that the left arm was extended at the time of the shooting. He did not observe

any soot and concluded, based upon the stippling, that the firearm was between six and twenty-four inches from the victim at the time of the shooting.

On cross-examination, Dr. Deering testified that he could not determine whether the victim was shot by someone who exercised self-defense. When asked if the victim would have been able "to raise his arms, ball up his fist, and throw a punch" after sustaining the gunshot wound, Dr. Deering said that it was possible but that the bullet struck the spinal cord, which would have resulted in the victim's falling on the ground. Dr. Deering said that the victim would have been conscious and might have had movement in his arms. Dr. Deering did not analyze the victim's hands for gunshot residue. Dr. Deering said that it was possible the victim's arm was extended because the victim "was throwing a punch or holding a weapon." Dr. Deering said that after falling on the ground, it was possible the victim could have fired a weapon if he still had use of his arms and noted that the victim would have been "conscious for a period of minutes." Dr. Deering stated that the victim's nose was not broken, that he saw no evidence the victim had been punched on the face, and that he saw no injuries to the mouth or teeth. He stated that he did not observe any evidence showing that the victim had been struck on the ribs with a hard metal object.

Murfreesboro Police Officer Derrick Bush testified that he responded first to the scene, that the victim had been shot, and that a handgun lay on a picnic bench seven to eight feet from the victim.

Murfreesboro Police Detective Ed Gorham testified that he responded to the scene and that the loaded .25-caliber handgun, which contained three bullets, was found on a table by another officer. Detective Gorham said that he found blood, a cell phone, and several cartridge casings. He stated that he found one .25-caliber cartridge casing and one .9-millimeter cartridge casing, along with two bullet holes and a shattered window of a Toyota 4Runner in the parking lot. He recalled that a bullet fragment was removed from the 4Runner. He said that he returned to the police station and that he was advised by Detective James Abbott that a third cartridge casing should have been at the scene. Detective Gorham said that he returned to the scene and found a second .9-millimeter cartridge casing toward the back of the building and away from the crime scene. He said that he searched K.H.'s car and that he found marijuana and scales in the front passenger side.

On cross-examination, Detective Gorham testified that, generally, the number of reported gunshots rarely "matched up" with the number of cartridge casings recovered from a crime scene. He agreed that based upon the evidence at the scene, at least three rounds were fired. He did not recall the amount of marijuana found inside K.H.'s car. He said that the 4Runner had two bullet holes but that he could not determine if the shattered window was caused by a bullet.

Murfreesboro Police Detective Jennifer West, a cell phone extraction and examination expert, testified that she analyzed the victim's cell phone recovered from the crime scene. When reviewing text messages sent on the day of the shooting, the victim's phone contained messages from a person connected to an iCloud account. Detective West said that she advised the investigating detective to contact Apple to obtain further information about the account. She identified photographs of a text message exchange between the victim's phone and the iCloud account. Referring to the messages, Detective West stated the parties discussed a drug transaction. The messages reflect, in relevant part, that the victim's phone sent a message to the iCloud account asking if the person "[n]eed green?," that the parties agreed on a purchase price and amount, and that the buyer operating the iCloud account asked the victim to come to the buyer. The buyer provided an address on E Northfield Boulevard, and the victim informed the buyer when he reached the location. However, the buyer then provided a new address on Lascassas Pike, and the victim said he would meet the buyer at the subsequent location.

Detective West testified that the victim's phone contained a mapping application called Waze, that she opened the application, and that she saw two searches for locations within the Murfreesboro city limits. She identified the location information, which reflected a search for E Northfield Boulevard at 7:27 p.m. and a subsequent search for Lascassas Pike at 7:58 p.m. Other evidence showed that the last address searched was the location of the shooting.

On cross-examination, Detective West testified that the information she obtained from the victim's cell phone did not identify the person connected to the iCloud account. Detective West stated that the analysis she performed on the cell phone did not include deleted files or text messages. She agreed the messages showed that the victim initiated contact, that the victim offered to sell drugs, that the buyer negotiated a price, and that the victim boasted about the quality of the drugs. She agreed that the messages did not reference a robbery, threats, hostility, or "concern over this deal." She agreed that the two addresses provided by the buyer were close in proximity and that the last message sent from the victim expressed concern about police officers being in the area. She said that based upon her review of the phone, there was no evidence the messages had been altered or deleted.

Murfreesboro Police Detective Sergeant James Abbott testified that he assisted with witness interviews at the police station, that he spoke to Detective West about the victim's cell phone contents, and that he submitted an exigent circumstances request to Apple in order to obtain information about the iCloud account. He said that Apple granted the request, that the "Apple IDMS sign-ons was identified as a Charles M," and that Apple provided a cell phone number connected to the account. He said that his investigation of the phone number led him to Aurora Madry, whose sons were Mr. Soto-Morales and Mr. Mejias. Detective Abbott said that he executed a search warrant of Ms. Madry's apartment, that he spoke to Ms. Madry and to Mr. Soto-Morales at the apartment, and that he later

interviewed Mr. Mejias at the police station. Detective Abbott said that during his interview, Mr. Mejias identified the Defendant as having been involved in the victim's shooting. Detective Abbott said that the Defendant was interviewed the next day.

Murfreesboro Police Detective Sergeant Jacob Fountain testified that he reviewed the cell phone extraction information connected to the text messages exchanged between the victim's cell phone and the iCloud account. Detective Fountain said that, based upon his narcotics training, the fire and tree emojis sent from the victim's cell phone were related to marijuana. After reviewing the full exchange of messages, he pointed to the message from the victim's cell phone stating, "You trying to smoke with me? Ain't no one there sketchy," and stated that sketchy referred to a person who was involved in more serious drug-related criminal activity, including robberies or "rip[ping] them off." Referring to the message sent from the victim's phone, which stated, "Gimme a min and I'll send [the address] cause they'll be sketched if it's just you show up," Detective Fountain said that the message meant the recipient had a "bad reputation." After reviewing additional messages, he stated that the parties negotiated the price for marijuana that came from a state in which marijuana was legal, that the buyer wanted two ounces, and that the victim only wanted to sell one ounce for $230. Detective Fountain said that the additional discussion regarding price was related to the victim's stating that he had multiple customers who would purchase marijuana and that he intended to raise the price to generate profit. Referring to the message from the victim stating, "Ain't no sketch s---," Detective Fountain stated that the victim told the buyer that the buyer was not going to place the victim in "a bad situation . . . to get [the victim] either arrested or . . . robbed." Detective Fountain explained that the buyer denied being "into robbing people" and "getting [the victim] caught with law enforcement."

Detective Fountain testified that on May 20, 2017, he interviewed the Defendant at the police station and that the Defendant's stepfather and grandmother were present during the interview. A video recording of the interview was received as an exhibit and was played for the jury. In the recording, the investigator informed the Defendant that Jeremy Soto-Morales and Charles Mejias were in police custody in connection with the victim's shooting. The Defendant was advised of his *Miranda* rights, and the Defendant acknowledged he understood his rights.

In the recording, the Defendant stated that he and Mr. Mejias were friends, that "it all started at school," that Mr. Mejias missed the school bus, and that the Defendant "volunteered to walk [Mr. Mejias] halfway" home around 3:15 p.m. The Defendant said that he and Mr. Mejias did not discuss anything specific but chatted about "little kid stuff" while they walked toward Mr. Mejias's apartment complex, which was where the shooting occurred. The Defendant said that Mr. Mejias did not use his cell phone while they walked toward the apartment but that Mr. Mejias called his mother during school hours because Mr. Mejias wanted to be "picked up." The Defendant said that Mr. Mejias's mother picked them up around 3:30 or 4:00 p.m., which was before they reached Mr. Mejias's apartment,

that they accompanied her on a few errands, and that they went to Mr. Mejias's apartment. The Defendant said when they were at Mr. Mejias's apartment, they "chilled," that the Defendant viewed Instagram, and that Mr. Mejias exchanged text messages with an unknown person. The Defendant said that Mr. Mejias asked the Defendant to purchase marijuana but that the Defendant declined because he did not have any money. The Defendant said that Mr. Mejias asked if the Defendant wanted to go to McDonald's, which was close to the apartment complex. The Defendant said that he assumed they were going to McDonald's to buy food and that Mr. Mejias offered to pay for the food. When the investigator said that Mr. Soto-Morales and Mr. Mejias mentioned robbing the victim, the Defendant denied they discussed a robbery and said that Mr. Soto-Morales was not involved in the shooting. The Defendant said he and Mr. Mejias never made it to McDonald's, but he later said that Mr. Soto-Morales walked past him and Mr. Mejias when they walked toward McDonald's.

In the recording, the Defendant said that he and Mr. Mejias sat on a bench inside the apartment complex because Mr. Mejias was tired and that Mr. Mejias resumed sending text messages. The Defendant said he wore a black shirt and red pants. The Defendant said that Mr. Mejias "made" the Defendant hold Mr. Mejias's gun because Mr. Mejias's red shorts did not have any pockets. The Defendant said that the victim approached them, that Mr. Mejias "hit" the victim, and that Mr. Mejias shot the victim. When asked how the victim knew where to go inside the apartment complex, the Defendant said that he and Mr. Mejias walked toward the car in which the victim sat and that the Defendant went with Mr. Mejias because he was not "going to leave" his friend. The Defendant said that the victim left the car, that he did not speak to the victim, that Mr. Mejias spoke to the victim, and that they walked to the bench. The Defendant used a whiteboard to illustrate his position in relation to the positions of Mr. Mejias and the victim. The Defendant's drawing was not clearly visible in the recording. The Defendant said that Mr. Mejias hit the victim, that the Defendant placed the gun at the victim's "ribcage so he could stop shooting," that Mr. Mejias had been injured when the victim fired a gun, and that Mr. Mejias and the Defendant both ran. The Defendant said that when he ran, "he shot at him here." The Defendant indicated on the whiteboard where he ran and said, "I started shooting." When asked by the investigator to demonstrate the distance between the Defendant and the victim when the Defendant began shooting, the Defendant stood approximately four to six feet from the investigator. The Defendant said that he did not have the gun pointed at the victim's "side" before the victim displayed a firearm. The Defendant said that during the shooting, Mr. Mejias said that the victim's firing the gun resulted in a bullet grazing Mr. Mejias's arm. The Defendant said this "was the only reason I shot." The Defendant said that he fired the gun four or five times and that the victim fired twice, which included once at Mr. Mejias and once at the Defendant. The Defendant said he attempted to leave, that he turned around, and that he "just started shooting."

In the recording, the Defendant insisted that he was being honest when the investigator expressed doubts. The Defendant said that he heard "a cock" of a gun coming from the victim and that the Defendant placed the gun on the victim's ribcage. The investigator said that the evidence showed the victim was at the apartment complex to sell marijuana. The Defendant said that although Mr. Mejias showed him the money Mr. Mejias had to purchase marijuana, Mr. Mejias wanted to rob the victim. The Defendant said that Mr. Mejias wanted the Defendant to buy marijuana, that the Defendant did not want to buy marijuana, and that after the Defendant declined to buy marijuana, Mr. Mejias said, "Let's go to McDonald's." The Defendant said that the shooting "happened so fast" and that he was "scared for [his] life when he started shooting."

In the recording, the investigator stated that witnesses reported observing the Defendant place the gun into the victim's ribcage before the victim displayed his firearm. The Defendant denied that this was an accurate description of the events. The Defendant initially said that the victim took Mr. Mejias's money, ran, and "pulled the weapon out." The Defendant clarified that the victim did not take any money and that Mr. Mejias "took" the marijuana.

On cross-examination, Detective Fountain testified that the text messages did not reflect that "the sketchy person or the concerning person is Charles."

Upon this evidence, the jury found the Defendant guilty of first degree felony murder, second degree murder, facilitation of conspiracy to commit aggravated robbery, facilitation of aggravated robbery, and robbery in concert with two or more persons. Immediately following the verdicts, the trial court imposed a life sentence for the first degree murder conviction. At the sentencing hearing for the remaining convictions, the court imposed concurrent sentences of four years for facilitation of conspiracy to commit aggravated robbery, six years for facilitation of aggravated robbery, twelve years for robbery in concert with two or more persons, and twenty-five years for second degree murder. This appeal followed.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. He asserts that the evidence failed to establish that a robbery occurred in connection with all of the robbery-related offenses and that, as a result, the evidence is likewise insufficient to support his first degree felony murder conviction. He argues, as well, that the evidence failed to establish he acted knowingly relative to second degree murder and that the evidence supports his claim of self-defense. The State responds that the evidence is sufficient to support the Defendant's convictions. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

## A.    First Degree Felony Murder and Robbery-Related Convictions

The Defendant argues that the evidence is insufficient to establish that a robbery occurred and that, as a result, the evidence is insufficient to support his first degree felony murder and robbery-related convictions. He does not challenge the remaining elements of the conviction offenses. He also asserts the only evidence presented to establish that a robbery occurred was Mr. Soto-Morales's testimony, which the Defendant claims was not credible and was insufficiently corroborated.

As relevant to this appeal, first degree felony murder is defined, in relevant part, as the "killing of another committed in perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2). A culpable mental state is not required for a conviction, except the intent to commit the underlying felony. *Id*. at (b). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a).

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). Traditionally, Tennessee has followed the common-law rule that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *See, e.g.*, *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001), *abrogated by State v. Thomas*, 687 S.W.3d 223 (Tenn. 2024); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *overruled by Thomas*, 687 S.W.3d at 229; *Monts v. State*, 379

S.W.2d 34, 43 (Tenn. 1964), *overruled by Thomas*, 687 S.W.3d at 229.  Recently, our supreme court prospectively abolished the common-law rule and said that for all trials commencing after March 7, 2024, corroboration of accomplice testimony is not required. *Thomas*, 687 S.W.3d at 229.

Because the Defendant in the present case was tried before the *Thomas* decision was announced, we must apply the common-law rule in resolving this appeal.  To that end, for accomplice testimony to be adequately corroborated:

> [t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.  This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.  It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted), *abrogated by Thomas*, 687 S.W.3d at 229); *see Shaw*, 37 S.W.3d at 903.

Our supreme court clarified the corroboration requirement in *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014), *abrogated by Thomas*, 687 S.W.3d at 229.  Pursuant to the modified trustworthiness standard, "a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces 'independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury.'" *Id*. at 58 (quoting *State v. Lucas*, 152 A.2d 50, 60 (N.J. 1959)).  In other words, if the offense involves tangible injury, the prosecution "must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred." *Id*. at 59.  If, however, the offense does not involve a tangible injury, the prosecution "must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime." *Id*.  The court noted that offenses that do not involve a tangible injury "may include inchoate crimes, certain financial crimes, status crimes, and sex offenses lacking physical evidence and a victim who can testify." *Id*. at 59, n.28.  The substantial independent evidence "must corroborate essential facts contained in the defendant's statement," regardless of whether a tangible injury occurred, and evidence corroborating "collateral circumstances surrounding the confession will not suffice to establish trustworthiness." *Id*. at 59-60.

Regarding the question of whether a person is an accomplice, the term

"accomplice" does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense. To constitute one an accomplice, he must perform some act or take some part in the commission of the crime or owe some duty to the person in danger that makes incumbent on him to prevent its commission. An accomplice is "one culpably implicated in, or who unlawfully co-operates, aids, abets, or assists in, the commission of the crime charged."

The generally accepted test as to whether a witness is an accomplice is whether he himself could have been convicted for the offense, either as principal or accessory.

*Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (quoting 2 *Wharton's Criminal Evidence* § 448 (12th ed. 1955)). A person is not deemed an accomplice simply because he or she was present at the crime scene. *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974); *Hicks v. State*, 149 S.W. 1055, 1056 (Tenn. 1912).

In the light most favorable to the State, the record reflects that the trial court determined, as a matter of law, that Mr. Soto-Morales was an accomplice to the offenses and that it instructed the jury accordingly. The court, likewise, instructed the jury that Mr. Soto-Morales's testimony must be corroborated by evidence entirely independent of his testimony which would lead to the inferences that the crime had been committed and that the Defendant was implicated in the crime. The court explained that corroborative evidence could be direct or entirely circumstantial and need not be adequate to support a conviction. The jury is presumed to have followed the court's instructions in this regard. *See State v. Reid*, 164 S.W.3d 286, 346 (Tenn. 2005).

Mr. Soto-Morales testified that at his family apartment, he, the Defendant, and Mr. Mejias, who was Mr. Soto-Morales's brother, initially discussed purchasing marijuana from the victim but that the men ultimately decided to rob the victim of the drugs. Although Mr. Soto-Morales decided not to participate in the robbery and advised the Defendant and Mr. Mejias not to rob the victim of marijuana, the Defendant, whom Mr. Soto-Morales said possessed a firearm on his waist, and Mr. Mejias left the apartment intending to rob the victim of the drugs, rather than purchase them. The Defendant admitted during his police interview that he possessed the handgun during the shooting and shot twice at the victim. The Defendant also stated that although Mr. Mejias had money to purchase marijuana from the victim, Mr. Mejias wanted to rob the victim instead. Mr. Soto-Morales left the apartment, as well, but walked toward a store while watching the Defendant and Mr. Mejias, who began talking to two men, which other evidence showed were the victim and H.B. The Defendant admitted during his police interview that he and Mr. Mejias met the victim at the apartment complex and that they approached K.H.'s car as the victim sat

-14-

inside. The Defendant, Mr. Mejias, the victim, and H.B. walked past Mr. Soto-Morales, as Mr. Soto-Morales continued walking toward the store, and Mr. Soto-Morales heard gunshots a few seconds later. The Defendant admitted during his police interview that Mr. Mejias "hit" the victim before the shooting. After the shooting, Mr. Soto-Morales saw Mr. Mejias "running and limping," and the Defendant admitted during his police interview that Mr. Mejias was injured during the shooting. The Defendant had left the scene by the time Mr. Soto-Morales reached the victim, who lay on the ground after sustaining a single gunshot wound to the chest.

K.H. and E.M. each testified about the victim's purchasing marijuana before meeting at the apartment complex and communicating with an iCloud account, which other evidence showed was connected to Mr. Mejias and Mr. Soto-Morales's mother's telephone number. Mr. Mejias's first name was Charles, and the iCloud account was identified by Apple as having the identification of "Charles M." The Defendant admitted during his police interview that Mr. Mejias sent text messages before and after they left the apartment and sat on a bench before walking toward K.H.'s car. The jury could have reasonably inferred from this evidence that the victim and Mr. Mejias were parties to the message exchange.

K.H. and E.M. testified that the victim intended to sell marijuana to the person exchanging text messages with the victim. Marijuana and scales were found in the front-passenger area of K.H.'s car where the victim had been seated. Mr. Mejias directed the victim to multiple locations before directing the victim to go to the apartment complex where the shooting occurred. The women, the victim, and H.B. waited inside K.H.'s car while waiting for Mr. Mejias. Data extracted from the victim's cell phone showed a search for an initial address provided by Mr. Mejias and for the apartment complex at which the shooting occurred.

After waiting at the apartment complex, the Defendant and Mr. Mejias approached K.H.'s car, and one man spoke to the victim through the passenger-side window. The Defendant stated during his police interview that Mr. Mejias spoke to the victim. Although the Defendant and Mr. Mejias were invited inside the car, Mr. Mejias was abrupt, abrasive, and demanded the victim and H.B. leave the car for the drug transaction. All four men walked behind K.H.'s car and out of view, and a few minutes later K.H., E.M., and Mr. Soto-Morales, along with other witnesses, heard gunshots. The Defendant admitted during his police interview that he and Mr. Mejias left the scene, and K.H. and E.M. said the two men who approached her car were no longer at the scene by the time they reached the victim. Ms. Hani, a resident of the apartment complex, saw the four teenagers "hanging out together" before the shooting and saw a man "try to escape from the other side of the apartment" afterward. The marijuana the victim intended to sell at the time of the shooting was not found near the victim, and the Defendant admitted during his police interview that Mr. Mejias took the marijuana before they both ran from the scene.

Forensic evidence showed that the victim's left arm and chest contained a stipple pattern from gunpowder abrasions, which led the pathologist to conclude that the victim's left arm was extended at the time of the shooting and that the firearm used to shoot the victim had been between six and twenty-four inches from the victim. The Defendant stated during his police interview that he "put the gun to [the victim's] ribcage" before the Defendant shot at the victim. Although evidence from the pathologist showed the gun was between six and twenty-four inches from the victim, the Defendant demonstrated with the investigator during his police interview a distance of four to six feet, which was inconsistent with the pathologist's conclusion. Other evidence showed that two handguns, a .25-caliber and a 9-millimeter, were fired during the incident. K.H. knew the victim possessed a gun at the time of the shooting, and the victim's silver and white .25-caliber handgun was found near the victim after the shooting. Two 9-millimeter cartridge casings were found at the scene, along with a single .25-caliber cartridge casing. The Defendant stated during his police interview that the victim fired his weapon twice and that the Defendant fired more than twice.

Text messages exchanged between the victim and Mr. Mejias reflected that the victim initiated contact with intent to sell marijuana. The parties discussed whether Mr. Mejias would rob or place the victim in a position to be arrested, and Mr. Mejias explained he was not "into robbing people." The parties negotiated and agreed upon a price for the marijuana, and Mr. Mejias ultimately directed the victim to the apartment complex at which the shooting occurred.

We conclude that the evidence is sufficient to support a determination that a robbery occurred and that the evidence sufficiently corroborated Mr. Soto-Morales's testimony that the Defendant and Mr. Mejias intended to rob the victim of marijuana. The Defendant's statement to the police reflects that Mr. Mejias took drugs from the victim and ran from the scene. Money was not found at the scene. The victim arranged a drug transaction with Mr. Mejias, and after Mr. Mejias and the Defendant approached K.H.'s car, Mr. Mejias demanded that the victim and H.B. leave the car and move to a nearby bench within the apartment complex to conduct the transaction. Mr. Soto-Morales saw Mr. Mejias and the Defendant, who, by his own admission, was armed with a handgun, walk with the victim and H.B. just before the gunshots were heard. The Defendant admitted shooting at the victim, and two 9-millimeter cartridge casings were found at the scene. One of these casings was found toward the back of the building and away from the scene, and the Defendant admitted that after he turned around to leave, he "just started shooting." Furthermore, text messages exchanged between the victim and Mr. Mejias, along with other cell phone data, were consistent with the testimony of K.H. and E.M. regarding the drug transaction.

Based upon this evidence, the jury could have reasonably concluded that the Defendant and Mr. Mejias met the victim with the intent to rob the victim of marijuana, that they robbed the victim of marijuana at gunpoint, and that the victim died from a fatal

gunshot wound during the robbery. As a result, the evidence is sufficient to support the Defendant's first degree felony murder and robbery-related convictions.

In reaching this conclusion, we have not overlooked the Defendant's argument that Mr. Soto-Morales's testimony was not credible. However, this court does not reweigh or reevaluate the evidence, and the determination of the credibility of the witnesses, along with the weight and value to be given to the evidence, is within the sole province of the jury. *See Bland*, 958 S.W.2d at 659; *see also Sheffield*, 676 S.W.2d at 547. The evidence sufficiently corroborated Mr. Soto-Morales's testimony, and the jury was presented with evidence of Mr. Soto-Morales's plea agreement, his inconsistent statements to the police, and his involvement in the case. The jury's verdict reflects that it credited Mr. Soto-Morales's testimony, along with the remaining witness testimony and evidence. The Defendant is not entitled to relief on this basis.

## B.     Second Degree Murder

The Defendant argues that the evidence failed to show that he acted knowingly. Although he concedes that he fired a gun in the victim's direction, he argues that he acted in self-defense and that the evidence failed to show that he knew his actions could lead to the victim's death. He asserts that the evidence did not show "he knew shooting the gun may kill" the victim.

Second degree murder is a knowing killing of another. T.C.A. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (2018). With regard to second degree murder, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b) (2018); *see State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

At the time of the offense, the self-defense statute provided:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(1), (2)(A)-(C) (Supp. 2017) (subsequently amended). Once a defendant has raised sufficient facts to support a finding he acted in defense of self, "[t]he state has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996) (citing T.C.A. § 39-11-201(a)(3)).

The record reflects that the defense theory was that the Defendant acted in self-defense and in defense of Mr. Mejias by shooting the victim. The Defendant stated during his police interview that Mr. Mejias hit the victim, that the Defendant placed the gun at the victim's "ribcage so he could stop shooting," that Mr. Mejias was injured when the victim fired a gun, and that Mr. Mejias and the Defendant both ran. The Defendant said that when he ran, "he shot at him here." The Defendant denied that he placed a firearm at the victim's ribcage before the victim displayed a handgun and asserted that he shot at the victim to defend himself and Mr. Mejias. Other evidence showed that the victim was armed with a .25-caliber handgun, that a .25-caliber handgun was found near the victim, and that a single .25-caliber cartridge casing was found at the scene, along with two 9-millimeter cartridge casings. Based upon this evidence, the Defendant fairly raised claims of defense of self and of Mr. Mejias, and the Defendant asserted during closing argument that he acted in such a capacity. Therefore, the trial court properly instructed the jury on self-defense and on the defense of a third person. The court determined that the Defendant was engaged in unlawful activity by possessing a firearm with the intent to go armed and by possessing a firearm while being under age eighteen and instructed the jury accordingly on the duty to retreat. *See* T.C.A. § 39-17-1319 (2018); *see also State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017).

The jury was presented with evidence that the Defendant acted in self-defense and in defense of Mr. Mejias. However, the State presented ample evidence that the Defendant and Mr. Mejias intended to rob the victim, robbed the victim at gunpoint, and that any fear of imminent danger of death or serious bodily injury to the Defendant and Mr. Mejias was unreasonable. Moreover, the Defendant demonstrated during his police interview that he was approximately four to six feet from the victim when he fired the handgun at the victim and was not retreating before shooting at the victim. The forensic evidence showed that the victim and the Defendant's gun were separated by six to twenty-four inches. The State presented sufficient evidence to negate the Defendant's claim of self-defense and defense of Mr. Mejias. The jury's verdict reflects that it discredited the Defendant's claims that

-18-

the victim fired a handgun first in favor of evidence supporting a determination that the Defendant and Mr. Mejias robbed the victim of marijuana at gunpoint and fatally shot the victim during the robbery.

Relative to the second degree murder conviction, in the light most favorable to the State, the evidence shows that the Defendant twice fired a handgun at close range at the victim. The Defendant held the handgun at the victim's ribs and fired the handgun six to twenty-four inches from the victim. Based upon this evidence, the jury could have found beyond a reasonable doubt that the Defendant acted knowingly because firing a gun at the victim's chest at close range was reasonably certain to cause the victim's death. The evidence is sufficient to support the Defendant's second degree murder conviction. He is not entitled to relief on this basis.

## II.      First Degree Felony Murder Sentence

The Defendant asserts that because he was a juvenile at the time of the offenses, the trial court should have held a sentencing hearing for the first degree murder conviction pursuant to *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), rather than imposing an automatic life sentence upon the return of the jury's verdict. The State responds that although *Booker* applies to the Defendant, the trial court did not err by imposing a life sentence because the sentence was required by statute. The State argues, though, that because the Defendant was a juvenile at the time of the murder, the Defendant is entitled to a specialized parole hearing after serving between twenty-five and thirty-six years of his life sentence pursuant to *Booker*. We agree with the State.

The parties do not dispute that the Defendant was a juvenile at the time of the offenses, and our review of the record shows that he was age seventeen. Pursuant to statute, the trial court imposed a life sentence for the first degree felony murder conviction upon the jury's verdicts without consideration of the Defendant's age and other circumstances. *See Montgomery v. Louisiana*, 577 U.S.190 (2016); *see also* T.C.A. § 40-35-501(h)(1), (2) (2019). A subsequent sentencing hearing for the remaining convictions was held, but the transcript is not included in the appellate record.

However, after the February 2022 trial, the supreme court released *Booker*, which addressed sentencing considerations for juveniles convicted of first degree murder. The court determined that the statutory life sentence imposed on a juvenile defendant convicted of first degree murder without consideration for the defendant's "age and other circumstances" violated the constitutional "prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution." *Booker*, 656 S.W.3d at 52. The court concluded that for homicide convictions, a trial court "must have discretion to impose a lesser sentence after considering the juvenile's age and other circumstances." *Id*. at 53. However, because the trial court in *Booker* was required by statute to impose a sentence of life imprisonment and was, therefore, deprived of exercising

its discretion, a constitutional violation occurred. *Id*. The court, though, declined to grant the defendant a new sentencing hearing. The court determined that the appropriate remedy was to grant the defendant "an individualized parole hearing" at which the defendant's age and other circumstances would be considered after serving twenty-five to thirty-six years of a life sentence. *Id*.; *see Montgomery*, 577 U.S. at 212 ("A State may remedy a . . . violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them."); *see also* T.C.A. § 40-35-501(i)(1), (2) (prohibiting release eligibility for first degree murder and requiring sixty years' confinement less sentence reduction credits of no more than fifteen percent).

In the present case, the trial court imposed a mandatory sentence of life imprisonment for the Defendant's first degree felony murder conviction. However, because such a sentence, without consideration of the Defendant's age and other circumstances, violated his constitutional protections against cruel and unusual punishment, *Booker* holds that he will be entitled to an individualized parole hearing after serving between twenty-five and thirty-six years of his sentence. *See Booker*, 656 S.W.3d at 53. He is not entitled to a new sentencing hearing, and the trial court did not err by declining to hold a subsequent sentencing hearing for the first degree felony murder conviction.

Although the *Booker* court mandated that juvenile defendants convicted of first degree murder receive an individualized parole hearing after serving between twenty-five and thirty-six years, little guidance has been provided regarding the procedure to ensure future juvenile defendants receive the parole hearing at the appropriate time at the department of correction and the board of parole. In *Booker*, the court ordered the Clerk of the Appellate Court to provide the Tennessee Department of Correction and the Tennessee Board of Parole with a copy of its opinion. *Id*. at 68. The court did not address what, if anything, trial courts might do in future similar cases to ensure the department of correction and the board of parole afford a juvenile the individualized parole hearing at the appropriate time. After considering the sentencing procedure in future similar cases, we conclude that the prudent course is for a trial court to note in the special conditions section of the judgment form that the juvenile defendant is entitled to an individualized parole hearing, at which the defendant's age and other circumstances shall be considered, after serving between twenty-five and thirty-six years' confinement pursuant to *Booker*. *Id*. at 66-68. This notation on the judgment form serves multiple purposes, including the need to ensure juvenile defendants' Eighth Amendment rights are not violated because of administrative errors, to promote judicial economy and efficiency, and to prevent potential voluminous and unnecessary collateral litigation by defendants who have been denied their individualized parole hearing at the appropriate time. In consideration of these principles, we remand this case for the entry of an amended judgment form to reflect such notation in the special conditions section of the first degree felony murder judgment.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court. The case is remanded for the entry of an amended judgment for the first degree murder conviction to reflect that the Defendant is entitled to an individualized parole hearing after serving between twenty-five and thirty-six years in confinement pursuant to *Booker*.

_____
ROBERT H. MONTGOMERY, JR., JUDGE